IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

CRYSTAL WESTCOTT,    )  CASE NO. 5:13CV01099
          )
    Plaintiff,  )
          )
    v.    )  MAGISTRATE JUDGE
          )  KATHLEEN B. BURKE
COMMISSIONER OF SOCIAL,  )
SECURITY ADMINISTRATION,  )
          )  **MEMORANDUM OPINION & ORDER**
    Defendant.  )

Plaintiff Crystal Westcott ("Plaintiff" or "Westcott") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying her

applications for supplemental social security income ("SSI") and disability insurance benefits

("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before

the undersigned Magistrate Judge pursuant to the consent of the parties.  Doc. 15.

For the reasons stated below, the Commissioner's decision is **AFFIRMED**.

## I.  Procedural History

Westcott filed her applications for SSI and DIB on November 3, 2008, alleging a

disability onset date of December 30, 2003.[1]  Tr. 16, 54-57, 111, 541-43.  She alleged disability

based on attention deficit disorder ("ADD"), attention deficit hyperactivity disorder ("ADHD"),

and she listed "unable to read/5th grade level" as a condition limiting her ability to work.  Tr.

---

[1] The record is inconsistent with regard to Westcott's disability onset date.  Westcott's DIB and SSI application summaries list February 15, 2004, as her disability onset date.  Tr. 54-57, 541-43.  However, the Social Security Disability Field Office Report and the ALJ's decision list December 30, 2003, as Westcott's disability onset date. Tr. 16, 111.  For purposes of this Court's review, determination of the accurate disability onset date is not material.

116.  After denials by the state agency initially and on reconsideration (Tr. 33-35, 38-41, 545-551), Westcott requested a hearing.  Tr. 42-43.   A hearing was held before Administrative Law Judge Traci M. Hixon ("ALJ") on May 2, 2011.  Tr. 552-585.

In her October 4, 2011, decision, the ALJ determined that Westcott's residual functional capacity ("RFC") did not prevent her from performing work existing in significant numbers in the national economy, i.e., she was not disabled.  Tr. 13-25.  Westcott requested review of the ALJ's decision by the Appeals Council. Tr. 12.  On March 23, 2013, the Appeals Council denied Westcott's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 5-18.

## II. Evidence

### A.  Personal and Vocational Evidence

Westcott was born in 1982 and was 21 years old on the alleged disability onset date of December 30, 2003.  Tr. 24, 555.  Westcott has a high school equivalent education and no past relevant work.  Tr. 24, 556, 576-578.  She stated that she stopped working in February 2004 because she didn't have a babysitter for her child.  Tr. 116.

### B.  Medical Evidence related to Plaintiff's Mental Health Impairments[2]

Dr. Dayem & Mr. Supan.  Dr. Michael Dayem, M.D., treated Westcott from at least 2008 through 2011. Tr. 293-94, 405-406, 408-414, 495-496.  On December 14, 2008,[3] Dr. Dayem stated that Westcott was hospitalized after leaving a message on his answering service stating

---

[2] Plaintiff only challenges the ALJ's findings with respect to her mental health impairments. Accordingly, only the medical evidence relating to those claims is summarized herein.

[3] The record does not contain any treatment notes from Dr. Dayem prior to December 14, 2008; however, in the December 14, 2008, treatment note Dr. Dayem states that Westcott is his patient and has been seen at his private office previously.  Tr. 293.

that she was afraid she was going to kill her fiancé or herself.  Tr. 293.    Westcott voluntarily

admitted herself into the hospital, at which point she denied being suicidal or homicidal.  Tr. 294.

Westcott was discharged the next day.  Id.  Dr. Dayem stated that Westcott's past psychiatric

history is "[s]ignificant for being diagnosed as ADD" and noted that she also "carries multiple

diagnoses including bipolar disorder [and] mood disorder..."  Tr. 293.

On January 31, 2008, Westcott was seen by Thomas Supan, Licensed Professional

Clinical Counselor.  Tr. 296-97.  Mr. Supan stated that Westcott was in "good spirits" and was

"doing very well."  Tr. 296.  Mr. Supan stated that Westcott was proud that she obtained her

GED and she showed off her grades which were "mostly As with a couple of Bs."  Id.   Mr.

Supan stated that Westcott should follow up with him again in a month.  On April 28, 2009,

Westcott's psychological records were closed out due to "inconsistent" follow-up, noting that

she had not been seen since the January 31, 2008, visit.  Tr. 291-92.

The records do not reflect any additional psychological treatment until 2011.  On

February 2, 2011, Dr. Dayem reported that Westcott was handling her recent diabetes diagnosis

well and had a normal mood.  Tr. 408-409.  Westcott reported that she was fatigued and was

having a hard time sleeping.  Tr. 408.  Dr. Dayem prescribed Vitamin D and Restoril and advised

Westcott if she was not sleeping within two hours of taking the medications to also then take

Xanax.  Tr. 411.   Dr. Dayem noted diagnoses of ADD and recurrent major depression, severe.

Tr. 409.  On March 2, 2011, Westcott returned to Dr. Dayem.  Tr. 412.  Dr. Dayem noted an

additional diagnosis of panic disorder without agoraphobia.  Tr. 413.   In a medication comment

section, Dr. Dayem noted that Westcott had been taking Adderall since September 2006.  Id.

Also, in 2010 and 2011, Dr. Dayem completed Medical Source Statements ("MSS") on

Westcott's behalf.  On December 12, 2010, Dr. Dayem completed an MSS form on which he

3

rated Westcott's ability to perform basic mental activities of work as "poor," defined as "[a]bility to function is significantly limited," in 18 of 21 categories.  Tr. 23, 405-06.  On April 7, 2011, Dr. Dayem again completed an MSS form on Westcott's behalf.  Tr. 495-96.  Dr. Dayem again rated Westcott's ability to perform basic mental activities of work as "poor," defined as "no useful ability to function in a competitive setting.  May be able to perform in a sheltered setting," in 18 of 21 categories.  Tr. 23, 495-96.

     <u>Consultative Examination - Dr. Zerba.</u>  On February 3, 2009, Dr. Margaret Zerba, Ph.D., performed a psychological consultative examination of Westcott.  Tr. 268-72.   Westcott reported that she was diagnosed with ADHD and manic-depression.  Tr. 268.  Westcott reported no problems with anxiety and no history of panic attacks.  Tr. 270.  She reported that she was on probation after a fight with her fiancé's sister, but that "[i]t was self-defense."  Tr. 269. Westcott reported that she had never been fired from a job.  Id.  Dr. Zerba stated that Westcott appeared depressed with flat affect.  Id.  Westcott stated,

> I hear voices.  I'm hearing them now.  They're telling me to walk out of the office.  A couple of times they told me to commit suicide but I won't, because of my children.  The voices started when I was five years old when my dad started beating me.

Tr. 270.  Dr. Zerba diagnosed Westcott with post-traumatic stress disorder, major depressive disorder with psychotic features, and ADHD.  Tr. 271.  Dr. Zerba opined that Westcott had no impairment in her ability to understand and follow directions or her ability to pay attention to perform simple, repetitive tasks.  Tr. 272.  Dr. Zerba further opined that Westcott was markedly impaired in her ability to relate to others in the work environment and her ability to withstand stress and pressures of day to day work activity "due to depression, problems with sleep, auditory hallucinations, hypervigilance, possible paranoia, fifth grade reading level and ADHD issues."  Id.

State Agency Review.  On February 11, 2009, Alice Chambly, Psy.D., state agency psychological consultant reviewed the evidence of record and opined that Westcott retains the capacity to perform simple, repetitive tasks in a non-public setting without the demands of fast-paced, high production work or frequent changes in assigned tasks.  Tr. 276.  Dr. Chambly also opined that Westcott can interact on a superficial level and adapt to routine changes.  Id.  In support of Dr. Chambly's opinion, she stated that Westcott is able to drive, go out alone, lives with fiancé, cares for her two young children, enjoys working on cars, recently obtained her GED, performs chores, and helps her sister with meals.  Tr. 275.

On August 11, 2009, Tonnie Hoyle, Psy.D., state agency psychological consultant also reviewed the evidence of record and opined that there was no evidence of a worsening in Westcott's condition.  Tr. 298.  Dr. Hoyle noted that Westcott showed rapid improvement after her December 2008 hospitalization and had made progress in her therapy.  Id.  Dr. Hoyle noted that, at the time of Westcott's 2008 hospitalization, she denied hallucinations and her mental treatment history lacked any indication of the same.  Id.  Dr. Hoyle stated that, "[t]his would shed doubt on the credibility of [Westcott's] statements at [her exam by Dr. Zerba] where she stated she was actively hallucinating and has since age 5."  Id.

**C.  Testimonial Evidence**

**1.      Westcott's Testimony**

At the administrative hearing, Westcott was represented by counsel and testified that she cannot work because she "can't deal with other people telling me what I can do and what I can't do."  Tr. 563.  Westcott also stated that that she needs extra time to get things done due to the fact that she has a "fifth grade reading level" and is "real terrible" at math.  Id.  Westcott testified that she has trouble focusing due to her ADD.  Tr. 573-74. Westcott stated that she sees her

therapist variably, usually every month or two, depending on how good or bad she feels.  Tr. 565.  She stated that she does not believe she has any side effects from her medications.  Id. Westcott also testified she is afraid to be home alone because she starts hearing things like the rattling of pots and pans, people talking to her, or doors opening.  Tr. 575.

### 2.    Vocational Expert's Testimony

Vocational Expert Bruce Holderead ("VE"), testified at the hearing.  Tr. 576-585.  The ALJ asked the VE whether there were any jobs in the national or regional economy for a hypothetical individual of Westcott's age and education who can perform a full range of medium work; except that the individual should not be exposed to pulmonary irritants; would perform simple, routine tasks with simple, short instructions, making simple work-related decisions and having few workplace changes; would not perform at a production-rate pace or be required to read instructions, write reports, or perform math calculations; and have minimal contact with the public and superficial contact with co-workers and supervisors.  Tr. 579.  The VE testified that such a hypothetical individual could perform the following work:  salvage laborer (62,000 jobs nationally; 3,400 jobs in Ohio; 900 jobs in the Northeast Ohio region); sandwich maker (350,000 jobs nationally; 12,000 in Ohio; 2,500 in the Northeast Ohio region); and linen room attendant (40,000 jobs nationally; 1,600 jobs in Ohio; 500 jobs in the Northeast Ohio region).  Tr. 579-580.

The ALJ then asked the VE to add to the first hypothetical that the individual could have no contact with the public and also no contact with co-workers.  Tr. 580.  The VE testified that he wasn't aware of any job where an individual would never come into contact with another person.  Tr. 581-82.  The ALJ then asked if there would be any jobs for a hypothetical individual who was only occasionally able to maintain a regular work schedule and who was only occasionally able to maintain a work routine.  Tr. 582.  The VE clarified that he interpreted the

ALJ's question to mean that "two-thirds of the time" the individual would not be maintaining the work schedule.  Id.  Based on that interpretation, the VE testified there would be no jobs for such an individual.  Id.

Westcott's attorney then asked the VE whether an individual who is off-task on a regular basis, i.e. 15-20 percent of the time, would be able to maintain competitive employment.  Tr. 583.  The VE responded that that individual would not be able to maintain competitive employment.  Id.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.   If the claimant is doing substantial gainful activity, he is not disabled.

2.   If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.     If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.     If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.     If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[4] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In her October 4, 2011, decision, the ALJ made the following findings:

1.     The claimant meets the insured status requirements of the Social Security Act through June 30, 2005.  Tr. 18.

2.     The claimant has not engaged in substantial gainful activity since December 30, 2003, the alleged onset date.  Tr. 18.

---

[4] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

3.      The claimant has the following severe impairments:  attention deficit disorder, bipolar disorder, migraine headaches, and diabetes mellitus.  Tr. 18.

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.[5]  Tr. 19.

5.      The claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except she should not be exposed to any pulmonary irritants.  She can perform simple, routine tasks with simple, short instructions, making simple work-related decisions and having few workplace changes.  She cannot perform production rate pace work.  The work cannot involve reading instructions, writing reports, or performing math calculations.  She can have only minimal public contact and superficial contact with co-workers and supervisors.  Tr. 20-21.

6.      The claimant has no past relevant work.  Tr. 24.

7.      The claimant was born [in 1982] and was 21 years old, which is defined as a younger individual, age 18-49, on the alleged disability onset date. Tr. 24.

8.      The claimant has at least a high school education and is able to communicate in English.  Tr. 24.

9.      Transferability of job skills is not an issue because the claimant does not have past relevant work.  Tr. 24.

10.     Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 24.

11.     The claimant has not been under a disability, as defined in the Social Security Act, from December 30, 2003, through the date of this decision. Tr. 25.

The ALJ's decision became the final decision of the Acting Commissioner when the Appeals

Council denied Westcott's request for review of the ALJ decision on March 23, 2013.  Tr. 5.

---

[5] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

## V. Parties' Arguments

### A.        Plaintiff's Arguments

Plaintiff argues that the ALJ erred in assigning "no weight" to the opinions of Westcott's treating physician Dr. Dayem and "little weight" to the opinion of the examining physician Dr. Zerba.  Doc. 17, pp. 11-15.

### B.        Defendant's Arguments

In response, the Commissioner argues that substantial evidence supports the ALJ's evaluation of the medical opinion evidence.  Doc. 18, pp. 11-15.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Secretary of Health and Human Services,* 889 F.2d 679, 681 (6th Cir.1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**The ALJ gave appropriate weight to the opinions of Dr. Dayem and Dr. Zerba**

Westcott argues that the ALJ had no legitimate basis for rejecting the opinions of Dr. Dayem and Dr. Zerba and, therefore, such opinions were entitled to "controlling weight." Doc. 17, p. 14.

Dr. Dayem.  Dr. Michael Dayem, M.D., treated Westcott from at least 2008 through 2011.  Tr. 293-94, 405-06, 408-14, 495-96.  Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). Conversely, "[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record." *Blakley v. Comm'r Of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); (citing Soc. Sec. Rul. 96–2p, 1996 WL 374188, at *2 (July 2, 1996)).

Dr. Dayem's 2010 and 2011 opinions were both in the form of Medical Source Statements ("MSS") which rated Westcott's ability to perform basic mental activities of work. In both opinions, Dr. Dayem rated Westcott's ability to perform basis mental activities of work as "poor,"[6] in 18 of 21 categories including:  ability to follow work rules; use judgment; maintain attention and concentration; respond appropriately to changes in routine; maintain regular attendance and be punctual; deal with public; relate with co-workers; interact with supervisors; function independently without special supervision; work in coordination or proximity to others without being unduly distracted or distracting; deal with work stresses; maintain appearance;

---

[6] On the 2010 MSS "poor" was defined as "[a]bility to function is significantly limited." Tr. 405.  On the 2011 MSS "poor or none" was defined as "[n]o useful ability to function in a competitive setting.  May be able to perform in a sheltered setting."  Tr. 495.

socialize; behave in an emotionally stable manner; and relate predictably in social situations.  Tr. 405-06.

The ALJ's decision not to give Dr. Dayem's opinions controlling weight is supported by substantial evidence in the record.   Dr. Dayem's opinions were not "well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and were "inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).

With regard to supportability, Dr. Dayem's two opinions were expressed as checkmarks on a form without further explanation, comments, or clinical findings in support.  Id.  Even though medical opinions and diagnoses of treating physicians are entitled to great weight, the ALJ is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation.  *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir.2001); *King v. Heckler,* 742 F.2d 968, 973 (6th Cir.1984)).

As to consistency, the ALJ stated that Dr. Dayem's opinions were given no weight because "they are not supported by the treatment notes."  Tr. 23.  The treatment history with Mr. Supan is inconsistent with Dr. Dayem's opinions.  Mr. Supan noted that, in January 2008 (a month after Westcott's December 2008 hospitalization), she was in "good spirits" and "doing very well."  Tr. 296.  Westcott was proud of earning her GED and brought in her grades to show Mr. Supan that she earned "mostly A's with a couple of B's."  Id.  On April 28, 2009, Mr. Supan closed out Westcott's psychological records due to "inconsistent" follow-up, noting that she hadn't received psychological treatment for over a year.  Tr. 291-92.

The only psychological treatment notes after January 2008 are two treatment notes from Dr. Dayem in February and March 2011.  On February 2, 2011, Dr. Dayem reported that Westcott was handling her recent diabetes diagnosis well and had a normal mood.  Tr. 408-409.

Westcott reported that she was fatigued and was having a hard time sleeping.  Tr. 408.  Dr. Dayem prescribed Vitamin D and Restoril and advised Westcott if she was not sleeping within two hours to then take Xanax.  Tr. 411.   On March 2, 2011, Westcott returned to Dr. Dayem but no changes in her condition were noted. Tr. 412-13.

In addition, the ALJ noted other evidence in the record that contradicted Dr. Dayem's findings of severe mental limitations, including: Westcott's testimony that she attends to her personal care, takes care of her daughters, earned her GED, helps her two daughters with their homework; reports that Westcott was attentive and frequently participated in group discussions during her diabetes education class in 2011;  reports that Westcott helps her boyfriend at a mechanic store and keeps busy working on vehicles; evidence that she stopped working in 2004, not due to her impairments but because she didn't have a babysitter for her child; and evidence that Westcott had never been fired from a job.  Tr. 20, 22.

The ALJ also gave considerable weight to state agency physician Dr. Chambly's opinion, which was inconsistent with Dr. Dayem's opinions. In appropriate circumstances, opinions from State agency medical consultants may be entitled to greater weight than the opinions of treating or examining sources. Soc. Sec. Rul. 96–6p, 1996 WL 374180, at *3 (July 2, 1996).  Dr. Chambly opined that Westcott was mildly restricted in her activities of daily living and moderately restricted in the areas of social interaction, adaptation, and sustained concentration and persistence.  Tr. 273-74.  In support of her opinion, Dr. Chambly noted that Westcott had no recent hospitalizations, no mental health treatment from 2003 through 2005, she stated that she went to the movies with friends, was never fired from a job for failure to get along with others, was able to care for her two young children, drive, go out alone, perform household chores, and go shopping in stores.  Tr. 275, 278.  Based on her review of the record, Dr. Chambly opined that

Westcott could perform simple, routine tasks in a non-public setting without the demands of a fast-paced, high production environment or frequent changes in assigned tasks; interact with others on a superficial level; and adapt to routine changes in a work setting.  Tr. 274-76.

Based on all of the above, the ALJ's decision not to give Dr. Dayem's opinions controlling weight is supported by substantial evidence in the record.   Dr. Dayem's opinions were not "well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and were "inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).

When the treating physician's opinion is not given controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, 20 C.F.R. § 404.1527(c)(2)-(6). Although the regulations instruct an ALJ to consider these factors, they expressly require only that the ALJ's decision include "good reasons ... for the weight ... give[n] [to the] treating source's opinion"—not an exhaustive factor-by-factor analysis. *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1527(d)(2).  Good reasons "must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Blakley v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406–407; Soc. Sec. Rul. 96–2p.

As discussed above, the ALJ stated that Dr. Dayem's opinions were given no weight because they were "not supported by the treatment notes.  The treatment notes from February 2011 show improvement and an unremarkable mental status examination.  Even though the

claimant had recently been diagnosed with diabetes, she was handling it well." Tr. 23.  Although

the ALJ's articulation of his good reasons was brief, it was clear and made specific reference to

an exhibit in support.  Upon independent review of Dr. Dayem's treatment notes, this Court

reaches the same conclusion as that of the ALJ, namely, that the doctor's notes reveal nothing

that could have warranted his extreme diagnosis and conclusion regarding plaintiff's abilities.

The fact that the ALJ cited but one example (the February 2011 treatment note which showed

"improvement and an unremarkable diagnosis." Tr. At 23) does not diminish the ALJ's

conclusion, particularly when there are few treatment notes in the record and the majority of

treatment notes are consistent with the February 2011 note.[7]  Moreover, as discussed more fully

above, the ALJ's opinion outlined additional inconsistencies between Dr. Dayem's opinion and

the other evidence of record.

Thus, substantial evidence supports the ALJ's finding that Dr. Dayem's opinions were

entitled to controlling weight and the ALJ provided good reasons for giving "no weight" to the

opinions of Dr. Dayem which are "sufficiently specific to make clear to any subsequent

reviewers the weight the adjudicator gave to the treating source's medical opinion and the

reasons for that weight."[8] *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).

---

[7] Westcott argues that the February 2011 office visit also reflected a diagnosis of severe recurrent major depression.
Tr. 409.  While Westcott is correct, Dr. Dayem also noted that:  Westcott had "improved;" her current stressor was
her physical health but, despite her diagnosis of diabetes she was handling it well; her mood was euthymic and she
had a full affect.  Tr. 408-09.  Accordingly, the diagnosis alone says nothing about the severity of her condition.
*Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis of arthritis, of course, says nothing about
the severity of the condition.")

[8] "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial
evidence to support a different conclusion." *Buxton v. Halter,* 246 F.3d 762, 772 (6th Cir.2001) (citation omitted).
"This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court
interference." *Id.* at 773 (citations omitted).  Judicial review is limited to "whether there is substantial evidence in
the record to support the administrative law judge's findings of fact and whether the correct legal standards were
applied." *Elam ex rel. Golay v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir.2003); *Castello v.Comm'r of Soc.
Sec.*, 5:09 CV 2569, 2011 WL 610590 (N.D. Ohio Jan. 10, 2011) *report and recommendation adopted sub nom.
Castello ex rel. Castello v. Comm'r of Soc. Sec.*, 5:09 CV 2569, 2011 WL 610138 (N.D. Ohio Feb. 10, 2011).

<u>Dr. Zerba.</u>  Westcott also argues that the ALJ erred by not giving controlling weight to the opinion of the consultative examiner, Dr. Zerba.  Doc. 17, p. 14.  Plaintiff's argument is without merit.  Opinions from nontreating and nonexamining sources are never assessed for "controlling weight." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013), reh'g denied (May 2, 2013).  The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. Id., 20 C.F.R. § 404.1527(c).

As no treating-source opinion was deemed controlling, the ALJ weighed Dr. Zerba's opinion and found it was not supportable or consistent with the record.  Tr. 23.  Dr. Zerba opined that Westcott is markedly limited in her ability to relate to others in the work environment and ability to withstand stress and pressures of day to day work activity.  Tr. 272.  In support of this opinion, Dr. Zerba stated that Westcott is impaired "due to depression, problems with sleep, auditory hallucinations, hypervigilance, possible paranoia, fifth grade reading level and ADHD issues."  Id.  The ALJ gave Dr. Zerba's opinion "some weight" but discounted her finding that Westcott was markedly impaired in two areas.  Tr. 23.  The ALJ stated

> [I]n the two areas of marked impairment, Dr. Zerba appears to rely heavily on the claimant's statements that are not substantiated by the medical records.  For instance, the claimant told Dr. Zerba that she has experienced auditory hallucinations since age 5 but denied having hallucinations when asked by treating providers (Exs. 9F and 19F).  The undersigned gives little weight to the opinion regarding marked impairments.

Tr. 23.  The ALJ's reasons, including specific references to inconsistent records, support the weight the ALJ gave to Dr. Zerba's opinion.  Accordingly, the ALJ's decision to give "some weight" to Dr. Zerba's opinion is supported by substantial evidence in the record.

<u>*Gayheart.*</u>  Finally, Westcott argues that the ALJ's decision to give greater weight to Dr. Chambly than she gave to Drs. Dayem and Zerba is in conflict with the Sixth Circuit's decision

in *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375-76 (6th Cir. 2013).   In *Gayheart*, the Court held in relevant part that, in evaluating medical source evidence and opinions, an ALJ commits reversible error by subjecting the opinions of the claimant's treating physicians to closer scrutiny than the opinions of the state agency physicians. *Id.* at 380.   In that case, the Court observed that the ALJ rejected the opinions of the plaintiff's treating physicians for alleged internal inconsistencies and for being inconsistent with the record as a whole while at the same time accepting the opinions of the state agency physicians that suffered from the same flaws. *Id.*

The Court concludes, however, that *Gayheart* does not apply to this case because the record does not reflect that the ALJ scrutinized the opinions of Westcott's treating physician more closely than the opinions of the state agency consultant or applied a double standard in her evaluation of medical evidence.  *Hackle v. Colvin*, 1:12-CV-145, 2013 WL 1412189 (S.D. Ohio Apr. 8, 2013).  As discussed above, the ALJ offered good reasons supported by the evidence in the record for the weight assigned to the medical opinions in this case and the opinion of state agency consultant Dr. Chambly did not suffer from the same inconsistencies as the opinion of Dr. Dayem.  Consequently, the Court does not find that the ALJ's evaluation of the medical evidence is contrary to *Gayheart.*

## VII.  Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.


Dated:  May 16, 2014

_____
Kathleen B. Burke
United States Magistrate Judge